# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

JAMES L. WORDES,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,[1] Commissioner
of Social Security,

       Defendant.

No. C06-2061

**ORDER ON JUDICIAL REVIEW**

| | | |
|---|---|---|
| *I.* | *INTRODUCTION* | 2 |
| *II.* | *PRIOR PROCEEDINGS* | 2 |
| | *A.*   *Wordes' First Application for Disability Insurance Benefits and SSI Benefits* | 2 |
| | *B.*   *Wordes' Second Application for Disability Insurance Benefits and SSI Benefits* | 3 |
| *III.* | *PRINCIPLES OF REVIEW* | 4 |
| *IV.* | *FACTS* | 5 |
| | *A.*   *Wordes' Education and Employment Background* | 5 |
| | *B.*   *Administrative Hearing Testimony* | 6 |
| |     *1.*   *Wordes' Testimony* | 6 |
| |     *2.*   *Vocational Expert's Testimony* | 6 |
| |     *3.*   *Tammy Craig's Testimony* | 7 |
| | *C.*   *Wordes' Medical History* | 7 |
| |     *1.*   *Physical Health Evaluations* | 7 |
| |     *2.*   *Psychological Evaluations* | 12 |

---

[1]This case was filed originally against Jo Anne B. Barnhart, who was at that time
Commissioner of the Social Security Administration (SSA). On February 12, 2007,
Michael J. Astrue became Commissioner of the SSA, and he hereby is substituted as the
defendant in this action. See FED. R. CIV. P. 25(d)(1).

V.   CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
     A.   ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
     B.   Wordes' Residual Functional Capacity . . . . . . . . . . . . . . . . . . . .  16
          1. Effects of Wordes' Narcotic Use and Wordes' Ability to Reach  .  17
               a. Narcotic Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
               b. Ability to Reach . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
          2. "Simple, routine, constant tasks" and "Detailed" instructions . .  19
     C.   Reversal or Remand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

VII. ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

## I. INTRODUCTION

This matter comes before the Court on Plaintiff James L. Wordes' request for judicial review of the Social Security Commissioner's decision to deny his application for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits (docket number 3) filed on September 13, 2006. Wordes asks the court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Wordes requests remand for further evaluation of his claim.

## II. PRIOR PROCEEDINGS

### A. Wordes' First Application for Disability Insurance Benefits and SSI Benefits

Wordes applied for disability insurance benefits on April 30, 2001, alleging an inability to work since August 1, 1999, due to back problems and back pain. Wordes also applied for SSI benefits on April 30, 2001, alleging a disability onset date of July 1, 2000. Wordes' applications for both disability insurance benefits and SSI benefits were denied on August 29, 2001. On December 17, 2001, his applications were also denied on reconsideration. On February 17, 2002, Wordes requested a hearing before an Administrative Law Judge ("ALJ"). On September 5, 2002, Wordes appeared with counsel, via video conference, before ALJ John E. Sandbothe for an evidentiary hearing.

2

Wordes, Tammy Craig, Wordes' fiancée, and vocational expert G. Brian Paprocki testified at the hearing. In a decision dated December 12, 2002, the ALJ denied Wordes' claim. The ALJ determined that Wordes was not disabled and was not entitled to disability insurance benefits or SSI benefits because he was functionally capable of performing work that exists in significant numbers in the national economy. Wordes appealed the ALJ's decision. On March 28, 2003, the Appeals Council denied Wordes' request for review.[2]

### B. Wordes' Second Application for Disability Insurance Benefits and SSI Benefits

On February 10, 2003, Wordes filed his second application for disability insurance benefits, alleging an inability to work since August 1, 1999,[3] due to severe back and lower back pain. Wordes also filed a second application for SSI benefits on February 10, 2003, alleging a disability onset date of July 1, 2000.[4] Wordes' applications for both disability insurance benefits and SSI benefits were denied on March 18, 2003. On September 25, 2003, his applications were also denied on reconsideration. On November 17, 2003, Wordes requested a hearing before an Administrative Law Judge ("ALJ"). On August 8, 2005, Wordes appeared with counsel, via video conference, before ALJ George Gaffaney for an evidentiary hearing. Wordes, Tammy Craig, Lori Ulrich, Wordes' mother, and vocational expert Vanessa May testified at the hearing. In a decision dated January 11, 2006, the ALJ denied Wordes' claim. The ALJ determined that Wordes was not disabled and was not entitled to disability insurance benefits or SSI benefits because he was

---

[2] It appears from the record that Wordes did not appeal the March 28, 2003 decision of the Appeals Council. Instead, Wordes applied for benefits a second time on February 10, 2003.

[3] At the administrative hearing held on August 8, 2005, before ALJ George Gaffaney, Wordes amended his disability onset date to December 13, 2002. Because ALJ Sandbothe denied Wordes' first application for disability insurance benefits on December 12, 2002, his disability onset date needed to be changed to December 13, 2002 for his second application for disability insurance benefits.

[4] At the August 8, 2005 hearing, Wordes also amended his disability onset date for his second application of SSI benefits to December 13, 2002.

functionally capable of performing work that exists in significant numbers in the national economy. Wordes appealed the ALJ's decision. On July 21, 2006, the Appeals Council denied Wordes' request for review. Consequently, the ALJ's January 11, 2006 decision was adopted as the Commissioner's final decision.

On September 13, 2006, Wordes filed this action for judicial review. The Commissioner filed an answer on February 20, 2007. On April 23, 2007, Wordes filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that there is other work he can perform. On June 22, 2007, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the court to affirm the ALJ's decision. Wordes filed a reply brief on June 30, 2007. On April 20, 2007, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004)).

Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989), in turn quoting *Consolo v. Fed. Mar. Comm'n*, 282 U.S. 607, 620 (1966)).

In determining whether the ALJ's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester*, 416 F.3d at 889 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams*, 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Id.* (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)).

## IV. FACTS

### A. Wordes' Education and Employment Background

Wordes was born on January 14, 1972 and attended high school through the ninth grade. While in school, Wordes participated in special education classes. He has an IQ score of 97. Prior to his alleged disability date of December 13, 2002, Wordes was employed by several businesses for short periods of time between 1988 and 1994. In 1994, Wordes began employment with Waste Tech, Inc. in Denver, Iowa as a truck driver. He also operated a fork-lift, skid-loader, and end-loader for Waste Tech. In 1997, Wordes began working as a laborer for Norton Box & Pallet Company, located in Waverly, Iowa. In 1998, Wordes was employed by Top of Iowa, L.C. in Rudd, Iowa. He worked with hogs and power-washed hog pens at Top of Iowa, L.C. In 1999, Wordes injured his back lifting a hog weighing between 250-450 pounds. According to his first application for disability insurance benefits, Wordes has been unable to work due to back pain since August 1, 1999.

Case 6:06-cv-02061-JSS   Document 17   Filed 08/27/07   Page 5 of 22

## B. Administrative Hearing Testimony

### 1. Wordes' Testimony

At the August 8, 2005 administrative hearing, Wordes testified that he lives with Tammy Craig ("Craig") and their three children.[5] He testified that he takes care of the children while Craig is at work. He further testified that the oldest child helps him with taking care of the younger children. Wordes cooks for the children and occasionally sweeps the floor. He testified that he does not do the laundry, vacuum, or yardwork. He testified that he has difficulty reading and writing and rarely leaves the house to go out in public.

On a typical day, Wordes rotates between standing, sitting and lying down. He testified that he can stand for about 15 minutes before needing to sit down. He also testified he can sit for about 30 minutes before needing to get up and move around. Wordes testified that he able to sleep with the help of Zyproxa, an anti-psychotic drug prescribed by his doctor, which he takes before going to bed. Wordes also wears a Duragesic patch in order to reduce his back pain. However, Wordes has difficulty with his memory and concentration as a side-effect of wearing the Duragesic patch. He also uses a cane occasionally to help him walk on days when is back pain is severe. Wordes also has the ability to drive a car.

### 2. Vocational Expert's Testimony

Vocational expert Vanessa May ("May") also testified at the August 8, 2005 hearing. The ALJ provided May with the following hypothetical:

> [Wordes] would [be limited to] lifting 20 pounds with ten pounds being lifted frequently, can stand for 30 minutes at a time for two hours in an eight-hour workday, can sit 30 minutes at a time for six hours in an eight-hour workday. All the non-exertional, physical limits are occasional, stair climbing, ladder climbing, balance, stoop, kneel, crouch and crawl. Environmental limits frequently only exposure to

---

[5] The two oldest children, ages 11 and 7, are Craig's children from a previous relationship. The youngest child, age 3, is the daughter of Wordes and Craig.

> extremes of heat and cold, dust and fumes and humidity.
> Other limitations, he can do just simple, routine, constant tasks
> with occasional changes in a routine work setting and
> occasional independent decisions.

Using the ALJ's hypothetical, May testified that there were several light, unskilled jobs someone fitting the hypothetical could perform. These jobs included parking lot chauffeur (460 jobs in Iowa), car jockey[6] (790 jobs in Iowa), and escort vehicle driver (9,800 jobs in Iowa).

### 3. Tammy Craig's Testimony

Tammy Craig ("Craig") testified as a witness for Wordes at the August 8, 2005 administrative hearing. Craig is Wordes' girlfriend of eight years. She testified that they live together and have one daughter together. She works for a telemarketing agency and is the sole means of support for Wordes. She testified that due to his back pain, Wordes cannot bend down to pick up their three year old daughter, needs assistance getting out of bed, and needs assistance moving from a laying down position to a sitting position. She testified that the Duragesic patch is the only medication which manages Wordes' back pain, but the patch has significantly affected his ability to think, concentrate, and pay attention. Craig also testified that she reads things to Wordes and takes care of the finances because he is unable to do such activities. Lastly, Craig testified that the main reasons for Wordes' inability to work are "[h]is physical limitations, he's just not able to get up and down very well physically; and his remembering anything is very difficult for him."

### C. Wordes' Medical History

### 1. Physical Health Evaluations

On May 11, 1998, Wordes visited Rohlf Memorial Clinic, P.C. in Waverly, Iowa, for low back pain. According to his medical records, two weeks prior to his visit, Wordes was involved in a motor vehicle accident. Wordes told the treating physician that he had

---

[6] According to the Dictionary of Occupational Titles ("DOT"), a car jockey is also referred to as a "driver." See DOT section 919.683-014.

back problems since childhood. The physician examined Wordes and found that he was tender over the L-5 vertebra to percussion and had restricted forward flexion, right lateral flexion, and extension of the spine. The physician determined that Wordes had an acute lumbosacral strain. The physician recommended bed rest on a hard surface and prescribed Percodan and Robaxin for treatment.

On July 10, 2000, Wordes sought treatment for back pain and was treated by Dr. Roger L. Skierka, M.D. Dr. Skierka noted that Wordes had a history of back pain for a couple of years; however, he had never injured his back, "but just had chronic low back pain." Wordes informed Dr. Skierka that he had pulled something in his back while landscaping two weeks prior to seeking treatment. Wordes had pain in his right hip and significant pain when he tried to sit up from a laying down position. Dr. Skierka concluded that Wordes suffered from right side muscle spasms and recommended back exercises, icing his back, Flexeril, and Darvocet as treatment. Wordes returned to Dr. Skierka on July 18, 2000 with continued back pain. Dr. Skierka recommended that he continue with the treatment plan they had discussed on July 10, 2000 with the addition of heat treatments to his back and wearing a back-brace during the day.

On June 15, 2001, Wordes was examined by Dr. John A. Glaser, M.D. Dr. Glaser found that Wordes had "some" decreased range of motion of the lumbar spine, no palpable abnormality in the SI joint region, no obvious neurologic deficit in his lower extremities, and normal gait and balance. X-rays of his lumbosacal spine were normal. Dr. Glaser determined that Wordes "may have some mild disc space narrowing at L5-S1." Dr. Glaser recommended exercise as treatment. Wordes saw Dr. Glaser for a follow-up visit on July 25, 2001. An MRI was taken and it showed "some disc degeneration at L4-5, L5-S1 with a small left-sided bulge at L4-5, but nothing that can explain his pain." Dr. Glaser recommended a rehabilitation evaluation for treatment.

On August 1, 2001, Wordes was examined by Dr. Michael Giordano, M.D. for the purpose of determining whether surgery was an option for relieving his back pain. He was referred to Dr. Giordano by Dr. Skierka. Dr. Giordano's examination revealed no para

lumbar tenderness or point tenderness. Dr. Giordano also reviewed an MRI of Wordes' back and concluded that the lumbar spine was normal with no disc herniations, spinal stenosis, or evidence of degenerative spondylosis. Dr. Giordano recommended physical therapy to improve Wordes' back pain.

On August 10, 2001, Dr. Chrystalla B. Daly, D.O. reviewed Wordes' medical records on a consultive basis for Iowa Disability Determination Services ("DDS"). Dr. Daly noted "[t]here has never been a documented neurological deficit, nor palpable muscle spasm by any treating physician. The presence of mild disc space narrowing nonetheless is documented." Dr. Daly concluded that Wordes' allegations of total disability due to back pain "cannot clearly be supported by the medical evidence which supports only mild radiographic changes and normal neurological and physical exams."

On November 21, 2001, Wordes visited Dr. David W. Beck, at the request of Dr. Skierka, for a neurological surgery consultation and examination. Dr. Beck determined:

> [Wordes] is neurologically normal. He has degenerative disc disease at 3 levels. He claims he is in constant pain. . . . He can lift and carry up to 20 pounds. He cannot stand, walk, or sit without pain. He cannot stoop, kneel, crawl or bend without pain. . . . A work environment is not a problem.

Dr. Beck concluded that surgery would not relieve his pain and recommended the use of a Medrol pack as treatment. Wordes returned to Dr. Beck on December 12, 2001. Dr. Beck noted "some" degenerative disc changes at L4-5 and L5-S1. Dr. Beck treated Wordes with an epidural steroid injection at the L4. Wordes received another epidural steroid injection from Dr. Beck on February 28, 2002. Dr. Beck saw Wordes again on April 15, 2002, and noted that he had a "restricted range of motion to about 5° in all levels." However, Dr. Beck explained that surgery was not a solution for his back pain and recommended that he see a pain clinic.

On July 1, 2002, Wordes was examined by a pain specialist, Dr. Richard J. Leth, M.D. Dr. Leth diagnosed Wordes as having "[m]echanical low back pain with prominent

facet arthropathy in the clinical setting of degenerative disc disease." Specifically, Dr. Leth found "exquisite" tenderness over the L3-4, L4-5, and L5-S1 with moderate tenderness over the sacroiliac joints. Dr. Leth recommended treatment through radiofrequency denervation of the lumbosacral spine. Dr. Leth performed seven-level radiofrequency denervation of the lumbosacral spine on August 1, 2002. Wordes returned to Dr. Leth on September 3, 2002, and upon examination, Dr. Leth determined that Wordes' lumbar spine was pain free to palpatation; however, his right sacroiliac joint was "exquisitely" tender, as was the left side of his lumbosacral spine, including the sacroiliac joint. Dr. Leth recommended aggressive denervation of the right sacroiliac joint and left lumbosacral spine as treatment.[7]

An MRI was taken of Wordes' back on January 30, 2003. The MRI showed disc space narrowing at the L4-5 and L5-S1 disc spaces, mild circumferential disc bulge at L4-5 and L5-S1, a focal bulge of the discs at L4-5, and a slight central compression of the thecal sac. Dr. L.A. Liebscher, M.D. reviewed the MRI and concluded that:

> There is degenerative disc disease at L4-5 and L5-S1. There is a focal bulge with an acute radial tear centrally at L4-5 causing central compression of the thecal sac. No other focal disc herniation or area of spinal stenosis is seen.

On February 12, 2003, Dr. Russell Buchanan, M.D. examined Wordes. Dr. Buchanan determined that Wordes had limited range of motion in his back and tenderness on internal and external rotation of the lumbar spine. Dr. Buchanan concluded Wordes suffers from discogenic pain. Dr. Buchanan ordered a X-ray of Wordes' back. The X-ray was taken on March 14, 2003, and it showed mild osteoarthritic changes at the L5-S1 and mild decreased range of motion primarily in the flexion and extension. Wordes made a return visit to Dr. Buchanan on March 28, 2003, and showed "fairly significant" limitation of motion in the lumbar flexion. Dr. Buchanan recommended aqua therapy as treatment.

---

[7] It appears from the record that Wordes did not undergo this second radiofrequency denervation treatment.

On June 4, 2003, Wordes was examined by Dr. Gayathry Inamdar, M.D. Dr. Inamdar diagnosed Wordes with lumbar degenerative joint disease and right lower extremity anterior radiculopathy. Dr. Inamdar recommended a caudal epidural series as treatment. Dr. Inamdar also prescribed a low dose of Neurontin to help reduce Wordes' low back pain.

On December 3, 2003, Wordes met with Dr. Michael Weston, M.D. regarding his low back pain. Dr. Weston set up an appointment for Wordes to be evaluated at the St. Luke's pain clinic. Dr. Weston also refilled Wordes' prescriptions for Duragesic patches, Flexeril, Lortab, Temazepam, and Promethazine. Wordes saw Dr. Weston again on May 18, 2004, complaining of chronic low back pain. Dr. Weston stopped Wordes' use of the Duragesic patch and prescribed Hydrocodone and Etodolac as a new method to treat his pain.

On August 27, 2004, Wordes visited Dr. Jeffery Jauron, D.O. regarding his low back pain.[8] Dr. Jauron restarted Wordes on the Duragesic patch and prescribed Darvocet for his pain.[9] Dr. Jauron started Wordes' Duragesic patch at 100 mcg per 72 hours. On September 7, 2004, Dr. Jauron lowered Wordes' Duragesic patch to 50 mcg per 72 hours. On September 30, 2004, Dr. Jauron raised Wordes' Duragesic patch to 75 mcg per 72 hours. On October 28, 2004, Dr. Jauron raised Wordes' Duragesic patch to 100 mcg per 72 hours. On November 23, 2004, Dr. Jauron raised Wordes' Duragesic patch to 125 mcg per 72 hours and also took him off of Darvocet. On June 16, 2005, Dr. Jauron raised Wordes' Duragesic patch to 150 mcg per 72 hours.

On September 8, 2005, consultative physician, Dr. John D. Kuhnlein, D.O., examined Wordes for the purposes of providing a residual functional capacity ("RFC") assessment. Dr. Kuhnlein also performed an extensive review of Wordes' medical records

---

[8] It is not clear, but the record seems to indicate that Wordes moved and transferred to Dr. Jauron's care.

[9] Between August 2004 and June 2005, Wordes met monthly with Dr. Jauron to follow-up on his low back pain and refill his medications unless otherwise discussed above.

and produced a comprehensive medical history as part of his assessment. Dr. Kuhnlein concluded that Wordes: (1) could occasionally lift 20-25 pounds and frequently lift 10 pounds; (2) could stand and/or walk at least two hours in an eight-hour workday with normal breaks; (3) would be unaffected in sitting and pushing and pulling by his impairment; (4) could occasionally climb, balance, crouch, crawl, and stoop and frequently kneel; (5) is limited in reaching in all directions and unlimited in handling, fingering, and feeling; (6) is unlimited in seeing, hearing, and speaking; and (7) is limited by his impairment to exposure to temperature extremes, vibration, and hazards and is not limited to exposure to noise, dust, humidity/wetness, fumes, odors, chemicals, and gases. Dr. Kuhnlein also noted that motivation may be an issue for Wordes' ability to perform work-related activities because "previous psychological evaluations [indicated] cognitive problems." Dr. Kuhnlein further noted that Wordes' "significant ongoing narcotic use may create a hazard to himself or others in operating machinery or working [at] height."

### 2. Psychological Evaluations

On July 6, 2001, at the request of DDS, Dr. Ralph Scott, Ph.D., a licensed psychologist, met with Wordes for a psychological evaluation. Dr. Scott observed Wordes to be: (1) somewhat uncomfortable in the unfamiliar assessment setting, (2) discouraged at not having a job and having constant back problems, (3) mildly depressed, but without evidence of clinically significant anxiety, mania, or obsessive compulsive disorder, (4) able to exercise fairly good short-term memory, (5) moderately impaired as to remote memory functioning, and (6) passively and dependently pleasant. Dr. Scott summarized Wordes' psychological history as follows:

> [Wordes] presents a long history of learning and vocational problems; given his history, there is a possibility of early organicity. Having acquired a measure of learned helplessness and a limited vocational history which has involved physical work, [Wordes'] alleged back problem may impose stringent limitations on work prospects. Further, there is historical and ongoing evidence of depression exacerbated by stressors and the apparent impact of chronic back pain. Further, and adding

to [Wordes'] limited job options, he has borderline verbal skills and is functionally illiterate.

Dr. Scott's psychological assessment provided:

> [Wordes] came across as a person who might succeed in low skill work which does not require heavy physical tasks. . . . Cognitively, [Wordes] has definite limitations, and yet his interest in working with cars suggests that he might succeed at light mechanical work. [Wordes] cannot remember and understand verbal instructions, procedures, and locations beyond the third percentile. [Wordes] is cognitively capable of carrying out simple instructions if provided extensive supervision, but the quality of his attention, concentration and pace would be uneven. Socially, [Wordes] is passive but friendly and likeable; he could appropriately interact with supervisors and coworkers, but only in a limited way with the general public.

On August 8, 2001, Dr. Carole Davis Kazmierski, Ph.D. provided a functional capacity assessment based on Dr. Scott's psychological evaluation. Dr. Kazmierski concluded that Wordes' mental impairments were severe, including "probable borderline intellectual functioning," a learning disability, a depressive disorder, and personality change related to recurring back pain. Dr. Kazmierski further determined that Wordes was moderately limited in his ability to: (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (5) interact appropriately with the general public, and (6) respond appropriately to changes in the work setting. Dr. Kazmierski suggested that Wordes is capable of performing simple, routine tasks that are within his physical capabilities.

On May 19, 2003, Wordes saw Dr. Carroll Roland, Ph.D. for a second psychological evaluation. Dr. Roland drew the following conclusions:

> [Wordes] is . . . experiencing significant back pain, illiteracy, major depression with psychotic features, [and] alcohol

13

> dependence. . . . [Wordes] is unable to remember and carry
> out complex instructions given by supervisor personnel.
> [While] his memory appears to be sufficient for simple entry
> level repetitive work, his physical limitations would appear to
> preclude [him] from any employment settings.

Dr. Roland further determined that Wordes was moderately limited in his ability to:
(1) understand and remember detailed instructions, (2) carry out detailed instructions,
(3) maintain attention and concentration for extended periods, (4) complete a normal
workday or workweek without interruptions from psychologically based symptoms and to
perform at a consistent pace without an unreasonable number and length of rest periods,
(5) respond appropriately to changes in the work setting, and (6) set realistic goals or make
plans independently of others.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Wordes is not disabled. In making this determination, the
ALJ was required to complete the five-step sequential test provided in the social security
regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert*, 482 U.S. 137, 140
(1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344
F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the
> claimant has a severe impairment, (3) whether the impairment
> meets the criteria of any Social Security Income listings,
> (4) whether the impairment prevents the claimant from
> performing past relevant work, and (5) whether the
> impairment necessarily prevents the claimant from doing any
> other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger v. Barnhart*, 390
F.3d 584, 590 (8th Cir. 2004)); *see also* 20 C.F.R. 404.1520(a)-(f). "If a claimant fails
to meet the criteria at any step in the evaluation of disability, the process ends and the
claimant is determined to be not disabled." *Eichelberger*, 390 F.3d at 590-91 (citing
*Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir. 2002)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir. 1995) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. "'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'" *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)).

The ALJ applied the first step of the analysis and determined that Wordes had not engaged in substantial gainful activity since his alleged onset date, December 13, 2002. At the second step, the ALJ concluded, from the medical evidence, that Wordes had the following severe impairments:

> Degenerative disc disease of the lumbar spine; obesity; depression; anxiety; coronary artery disease; a learning disorder; alcohol dependence disorder in remission; [and] asthma.

At the third step, the ALJ found that Wordes "[did] not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, Regulations No. 4." At the fourth step, the ALJ determined Wordes' RFC as follows:

> [T]he claimant has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently. He can stand 30 minutes at a time, for up to two hours in an eight hour workday. He can sit 30 minutes at a time, for up to 6 hours in an eight hour workday. He can occasionally climb stairs, ladders, balance, stoop, kneel, crouch, and crawl. He can

15

> frequently work in areas of heat, cold, humidity, dust and
> fumes. He is able to do only simple, routine, constant tasks.
> He may have occasional changes in a routine work setting. He
> may occasionally engage in independent decision-making.

Using this RFC, the ALJ determined that Wordes met his burden of proof at the fourth step, because he was unable to perform his past relevant work. However, at the fifth step, the ALJ determined that Wordes, based on his age, education, previous work experience, and RFC, could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded Wordes was "not disabled."

## B. Wordes' Residual Functional Capacity

Wordes alleges that the ALJ erred in several respects. He argues that the ALJ erred in determining his RFC because after accepting the findings of consultative examiner, Dr. Kuhnlein, and giving them "great" weight, the ALJ failed to include Dr. Kuhnlein's opinion that Wordes' "significant ongoing narcotic use may create a hazard to himself or others in operating machinery or working [at] height" in Wordes' RFC or in the hypothetical question provided to the vocational expert. Wordes further argues that the ALJ erred in failing to include Dr. Kuhnlein's limitation on Wordes' ability to reach in the ALJ's RFC or the hypothetical to the vocational expert. Wordes also points out that the ALJ limited him to "simple, routine, constant tasks;" however, the jobs identified by the vocational expert required the ability to carry out "detailed" instructions. Wordes contends that the ALJ erred in determining that work exists in significant numbers which he could perform without resolving the conflict between performing "simple, routine, constant tasks" and activities which involve "detailed" instructions. Wordes requests that the court reverse the Commissioner's decision and remand it with directions to award benefits. Alternatively, Wordes requests this matter be remanded for further proceedings, including a reassessment of his RFC. The Commissioner argues that there is substantial evidence in the record as a whole which supports the ALJ's decision; and therefore, the decision should be affirmed.

### 1. *Effects of Wordes' Narcotic Use and Wordes' Ability to Reach*

#### a. *Narcotic Use*

Wordes includes driving a car as an example of Dr. Kuhnlein's opinion that his prescribed narcotic use for pain relief may be a hazard to himself or others when operating machinery or working at height. Wordes argues that Dr. Kuhnlein's opinion should have been included in the ALJ's RFC and hypothetical question to the vocational expert. Wordes maintains that, had Dr. Kuhnlein's opinion been included in the ALJ's RFC and hypothetical question to the vocational expert, the three jobs the vocational expert testified he could perform would not have been appropriate because all of those jobs require him to drive a car. Thus, Wordes contends that the ALJ erred by failing to address Dr. Kuhnlein's opinion regarding the effect his narcotic use would have on his RFC or the hypothetical provided to the vocational expert.

The ALJ is responsible for determining a claimant's RFC, which should be based on "'all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'" *Tellez*, 403 F.3d at 957 (quoting *Pearsall*, 274 F.3d at 1217). Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). However, the ALJ does not need to include all impairments that are suggested by the evidence. *Goff*, 421 F.3d at 794. The ALJ may exclude from the hypothetical any impairment that the ALJ rejects as either "untrue or unsubstantiated." *Hunt*, 250 F.3d at 625 (citing *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997).

In his decision, the ALJ afforded Dr. Kuhnlein's opinion "great weight." Specifically, the ALJ stated:

> Dr. Kuhnlein has personally and comprehensively examined the claimant. The doctor has evidenced a very careful and detailed review of the medical evidence. His findings are very

> well supported and are found consistent with other evidence in
> the record as a whole. The doctor's opinions have been given
> great weight, and greater weight than those of other treating
> and examining doctors as more complete and consistent.

In his RFC assessment, Dr. Kuhnlein provides that Wordes' impairments cause environmental limitations as to hazards, including machinery and heights. Dr. Kuhnlein then describes Wordes' limitation as to hazards in the following manner, "[Wordes'] significant ongoing narcotic use may create a hazard to himself or others in operating machinery or working [at] height." The RFC used by the ALJ in his decision and in the hypothetical posed to the vocational expert, is almost identical to Dr. Kuhnlein's RFC assessment, except that the ALJ disregards Dr. Kuhnlein's opinion that Wordes' narcotic use places a limitation on his ability to perform work around hazards.[10] The ALJ does not explain why he excludes this limitation from Wordes' RFC. The ALJ does not suggest that Dr. Kuhnlein's opinion as to the effects of Wordes' narcotic use is "untrue or unsubstantiated." *See Hunt*, 250 F.3d at 625. Because the ALJ gave Dr. Kuhnlein's opinion "greater weight than those of other treating and examining doctors as more complete and consistent" and Dr. Kuhnlein's opinions are not inconsistent with the record as a whole, the Court finds it appropriate to remand this case to allow the ALJ to further develop the record and his reasons for disregarding Dr. Kuhnlein's opinion as to the effects of Wordes' narcotic use on his RFC or include this opinion in the hypothetical to the vocational expert. *See Hunt*, 250 F.3d at 626 ("When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence.").

### b. *Ability to Reach*

Similar to his argument in *V.B.1.a.* above, Wordes notes that Dr. Kuhnlein's RFC places a limitation on his ability to reach. Wordes further points out that the three jobs the

---

[10] The ALJ also disregards Dr. Kuhnlein's opinion that Wordes' ability to reach is limited which will be discussed next. Otherwise, the ALJ follows Dr. Kuhnlein's RFC assessment.

vocational expert stated he could perform require reaching 1/3 to 2/3 of the time.[11] Thus, Wordes argues that the ALJ erred in failing to address his limited ability to reach on his RFC or in the hypothetical to the vocational expert.

In his RFC assessment, Dr. Kuhnlein provided that Wordes' impairments cause manipulative limitations in his ability to reach in all directions. Specifically, Dr. Kuhnlein limited Wordes to occasional reaching. Dr. Kuhnlein stated "[l]iterature indicates reaching over the shoulder increases stresses [at] the L5-S1 level because [of] the 'movement arm' phenomenon." The RFC used by the ALJ in his decision and in the hypothetical posed to the vocational expert, is almost identical to Dr. Kuhnlein's RFC assessment, except that the ALJ disregards Dr. Kuhnlein's opinion regarding Wordes' ability to reach. The ALJ does not explain why he excludes this limitation from Wordes' RFC. The ALJ does not suggest that Dr. Kuhnlein's opinion as to Wordes' ability to reach is "untrue or unsubstantiated." *See Hunt*, 250 F.3d at 625. Because the ALJ gave Dr. Kuhnlein's opinion "greater weight than those of other treating and examining doctors as more complete and consistent" and Dr. Kuhnlein's opinion is not inconsistent with the record as a whole, the Court finds it appropriate to remand this case to allow the ALJ to further develop the record and his reasons for disregarding Dr. Kuhnlein's opinion as to Wordes' ability to reach in his RFC or in the hypothetical to the vocational expert.

### 2. *"Simple, routine, constant tasks" and "Detailed" instructions*

The ALJ's RFC and hypothetical to the vocational expert limited Wordes to "simple, routine, constant tasks." The jobs which the vocational expert determined Wordes could perform require level 2 reasoning skills. According to the DOT, level 2 reasoning requires the employee to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and d]eal with problems involving a few concrete variables in or from standardized situations."[12] Wordes points out that his

---

[11] *See* DOT sections 915.473-010, 919.663-022, and 919.683-014.

[12] *See* DOT sections 915.473-010, 919.663-022, and 919.683-014.

psychological evaluations indicate that he has difficulty following or carrying out complex and detailed instructions. Wordes argues that the ALJ erred by simply limiting him to "simple, routine, constant tasks" in his RFC and the hypothetical to the vocational expert, and not including his difficulty with following detailed instructions.

The record demonstrates that Drs. Scott, Kazmierski, and Roland, the psychologists that provided Wordes' psychological evaluations, all found that he would have difficulty following and performing detailed instructions. Dr. Scott stated:

> [Wordes] cannot remember and understand verbal instructions, procedures, and locations beyond the third percentile. [Wordes] is cognitively capable of carrying out simple instructions if provided extensive supervision, but the quality of his attention, concentration and pace would be uneven.

Dr. Kazmierski determined that Wordes was moderately limited in his ability to: (1) understand and remember detailed instructions, (2) carry out detailed instructions, and (3) maintain attention and concentration for extended periods. Dr. Roland also determined that Wordes was limited in the same three areas. Dr. Roland further opined that "[Wordes] is unable to remember and carry out complex instructions given by supervisor personnel. [However,] his memory appears to be sufficient for simple entry level repetitive work. . . ." The ALJ does not refer to Dr. Scott's psychological evaluation in his decision, but gives a "great deal of weight" to Dr. Roland's opinion because her "psychological opinion is found well supported." The ALJ also gave "some" weight to Dr. Kazmierski's consultative review of Wordes' psychological evaluation because her "opinion is more consistent with the credible and properly weighted evidence in the record."

Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt*, 250 F.3d at 625 (citation omitted). Further, "the hypothetical question answered by a vocational expert must include all those impairments that are

substantially supported by the record as a whole." *Taylor*, 118 F.3d at 1278-79. However, the ALJ does not need to include all impairments that are suggested by the evidence. *Goff*, 421 F.3d at 794. The ALJ may exclude from the hypothetical any impairment that the ALJ rejects as either "untrue or unsubstantiated." *Hunt*, 250 F.3d at 625 (citation omitted).

The ALJ does not address his reasons for disregarding Drs. Scott, Kazmierski, and Roland's determinations that Wordes is limited in his ability to follow detailed directions. Furthermore, the ALJ does not suggest that these determinations are "untrue or unsubstantiated." *See Hunt*, 250 F.3d at 625. Had these determinations been included in the hypothetical presented to the vocational expert, her testimony or conclusions may have been different. Therefore, because the ALJ gave Dr. Roland's opinion a "great deal of weight" and Dr. Kazmierski's opinion "some" weight, and these opinions are not inconsistent with the record as a whole, the Court finds it appropriate to remand this case to allow the ALJ to further develop the record and his reasons for disregarding these opinions for his determination of Wordes' RFC or include these opinions in the hypothetical to a vocational expert. *See Hunt*, 250 F.3d at 626 ("When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence.").

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

Case 6:06-cv-02061-JSS   Document 17   Filed 08/27/07   Page 21 of 22

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to give reasons for disregarding certain opinions pertinent to Wordes' RFC and the hypothetical presented to the vocational expert. Accordingly, the Court finds that remand is appropriate.

### VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ should develop the record fully and fairly, and address Dr. Kuhnlein's opinions regarding the effects of Wordes' narcotic use and ability to reach on his RFC and the hypothetical question presented to the vocational expert. The ALJ should also address the opinions of Drs. Scott, Kazmierski, and Roland as to Wordes' ability to follow detailed instructions for his RFC and the hypothetical question presented to the vocational expert.

### VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this 27th day of August, 2007.

_____
JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA